**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 28, 2026

**BY ECF**
The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Shouzhi Zheng a/k/a "David,"* 25 Cr. 555 (SHS)**

Dear Judge Stein:

The Government respectfully submits this letter in advance of the sentencing of Shouzhi Zheng a/k/a "David," the defendant, which is scheduled for November 4, 2026. On August 4, 2026, the defendant pled guilty, pursuant to a plea agreement with the Government, to one count of misprision of a felony, in violation of Title 18, United States Code, Section 4. For the reasons explained below, the Government submits that a sentence within the stipulated United States Sentencing Guidelines ("Guidelines") range of zero to six months' imprisonment would be sufficient but not greater than necessary to meet the goals of sentencing, taking into account the defendant's approximately 21 months in pretrial detention.

## A. Overview

### *i. The Offense Conduct*

The defendant participated in a "check kiting" scheme that resulted in numerous banks suffering millions of dollars in losses. (Presentence Investigation Report ("PSR") ¶¶ 15-18). Some of the banks were large national institutions, while others were smaller local banks. (*Id.* ¶ 15). The defendant was responsible for instructing other participants on how to carry out the scheme by using false identification documents and managing bank accounts in a manner that would avoid detection by the victim banks. (*Id.* ¶¶ 18; 28; 37). The scheme involved participants depositing small amounts of money into bank accounts (the "Feeder Accounts") that they would use to write bad checks. (*Id.* ¶ 16). The Accounts would be kept open for significant periods of time and would receive regular small deposits to make it seem as if they were being used legitimately. (*Id.* ¶ 28). The participants would then write checks from the Feeder Accounts and deposit those checks into other accounts under their control (the "Payoff Accounts"), despite their knowing that the Feeder Accounts did not contain enough money to cover the value of the checks. (*Id.* ¶ 16). The participants took advantage of the fact that, when checks are deposited into accounts, banks typically make a portion of the funds from the checks—sometimes called the "float"—immediately available to accountholders. (*Id.* ¶¶ 12-13; 28). After bad checks were deposited into

the Payoff Accounts, participants in the scheme withdrew the float from the Payoff Accounts before the banks realized that the Feeder Accounts could not cover the value of the checks. (*Id.*).

Zheng admitted to being aware of this scheme and to advising participants about how to conceal their illicit conduct. (*Id.* ¶¶ 28; 37). This included by employing fake passports to open bank accounts and having participants wait months between when Accounts were opened and when they were overdrawn, to maintain the façade of regular bank accounts. (*Id.*). The defendant's individual conduct resulted in approximately $7,000 in losses. (*Id.* ¶¶ 28; 33). Each co-defendant is also responsible for thousands of dollars in additional loss, making the total loss from the scheme far greater. (*Id.*).

*ii. Procedural History and Applicable Guidelines Range*

On October 17, 2022, the defendant and seven others were charged with one count of conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349, and one count of conspiracy to commit access device fraud, in violation of Title 18, United States Code, Section 1029(b)(2). Zheng evaded arrest until November 26, 2024, when he was arrested and detained pending trial. On November 25, 2025, the defendant was indicted on one count of conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349, and one count of bank fraud, in violation of Title 18, United States Code, Section 1344. At arraignment, the defendant was ordered detained. Conferences in this case were repeatedly adjourned while the parties conferred regarding a resolution, including on multiple motions by the defendant, which the Government did not join. (*See, e.g.*, Dkts. 110; 112; 113).

On August 4, 2026, the defendant pled guilty to an Information charging him with one count of misprision of a felony, in violation of Title 18, United States Code, Section 4, pursuant to a plea agreement with the Government (the "Plea Agreement"). The parties stipulated to an offense level of 1 and a Criminal History Category of I, resulting in a Stipulated Guidelines Range of 0 to 6 months' imprisonment. The defendant was ordered released from custody after his change of plea. The Probation Office has also calculated a Guidelines range of 0 to 6 months' imprisonment, consistent with the Plea Agreement. (PSR ¶ 103).[1]

---

[1] Although it has no effect on the applicable Guidelines range, the Government's calculation of the Guidelines differs slightly from the calculation in the PSR.

Both the PSR and the Plea Agreement explain that, pursuant to U.S.S.G. § 2X4.1(a), the base offense level for misprision of a felony is nine levels lower than the offense level for the underlying offense, in this case, bank fraud conspiracy. In calculating the offense level for bank fraud conspiracy, the PSR states that, "[p]ursuant to [U.S.S.G.] §2B1.1(b), because the offense of conviction is not referenced to §2B1.1, the base offense level is six." PSR ¶ 40. But under U.S.S.G. § 2X1.1(a), the offense level for bank fraud conspiracy is based, in turn, on its substantive offense, bank fraud, in violation 18 U.S.C. § 1344, which *is* referenced to U.S.S.G. § 2B1.1, and because bank fraud has a statutory maximum term of imprisonment of 30 years, its base offense level is seven under U.S.S.G. § 2B1.1(a)(1), meaning the base offense level of bank fraud conspiracy is also seven under U.S.S.G. § 2X1.1(a). *See United States v. Mendesh*, No. 13 CR. 259 (RWS), 2017

**B. Discussion**

i. *Applicable Law*

While the Guidelines are no longer mandatory after *United States v. Booker*, 543 U.S. 220 (2005), "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Pollock*, 139 F.4th 126, 145 (2d Cir. 2025) (quoting *United States v. Friedberg*, 558 F.3d 131, 137 (2d Cir. 2009)). Courts "begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *Gall v. United States*, 552 U.S. 38, 49 (2007), before proceeding to consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. 18 U.S.C. § 3553(a)(1)-(7). To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (quoting *Gall*, 552 U.S. at 46).

ii. *The Defendant's Conduct Warrants a Custodial Sentence, Which He Has Now Served*

The Court should impose a sentence within the Stipulated Guidelines Range, which given his previous time in pretrial detention, would result in no additional custodial time for the defendant, and a period of supervised release. A sentence within the Stipulated Guidelines Range is necessary given the seriousness of the offense and the need to promote respect for the law. It is also needed to afford adequate general and specific deterrence.

As to the seriousness of the offense and the need to promote respect for the law, the defendant contributed to and worked with others to carry out a scheme that harmed numerous banks. The scheme involved the use of relatively sophisticated fake identification documents and, to date, the Government has not discerned how the participants obtained these documents. The scheme participants' facility with false identification documents made it easier for them to steal

---

WL 2495200, at *3 (S.D.N.Y. June 8, 2017) (calculating a base offense level of seven for bank fraud conspiracy).

The Guidelines calculation in the PSR also rejects the application of the zero-point offender adjustment under U.S.S.G. § 4C1.1 because Zheng was previously convicted of driving while intoxicated or under the influence in October 2021, which, based on U.S.S.G. § 4A1.2, Note 5, results in one criminal history point. Although the Government agrees that the PSR's calculation is correct, it will honor its application of U.S.S.G. § 4C1.1 in the Plea Agreement, which does not affect the Stipulated Guidelines Range.

These two changes to the Guidelines calculation in the PSR would, like the calculation in the Plea Agreement, result in a total offense level of zero, which is treated as a total offense level of one pursuant to U.S.S.G. Chapter 5, Part A, Note 2. The Guidelines range would therefore remain 0 to 6 months' imprisonment—*i.e.*, the Stipulated Guidelines Range.

significant amounts of money from banks over a long period of time. And they were able to open new accounts with ease each time the bank closed others.

The defendant's conduct alone calls for a custodial sentence, ratifying the term which the defendant has already served, but the Court should also consider the need to promote general deterrence. Check kiting is pervasive and causes significant losses to banks across the country. As noted above, many banks suffered significant losses as a result of this scheme. Banks in turn recoup those losses by raising costs for all customers. Put simply, there is a great societal interest in curbing schemes like the one the defendant and others engaged in. A meaningful sentence of imprisonment will send a message to members of the community and the public writ large that courts will not tolerate theft from financial institutions.

Five of Zheng's co-defendants have already been sentenced:[2]

- Kejin Zhang, who was responsible for approximately $167,000 in losses and whose Guidelines range was 12 to 18 months' imprisonment, was sentenced to 6 months' imprisonment and 6 months of home confinement by Judge Cronan;
- Chaobin Zheng, who was responsible for approximately $138,000 in losses and whose Guidelines range was 8 to 14 months' imprisonment, was sentenced to time served and 8 months of home confinement by Judge Ramos;
- Yi Zheng, who was responsible for approximately $573,000 in losses and whose Guidelines range was 24 to 30 months' imprisonment, was sentenced to 24 months' imprisonment by Judge Vyskocil;
- Hermes Hou, who was responsible for approximately $66,000 in losses and whose Guidelines range was 6 to 12 months' imprisonment, was sentenced to 4 months' imprisonment by Judge Hellerstein;
- Yi Liu, who was responsible for approximately $34,000 in losses and whose Guidelines range was 0 to 6 months' imprisonment, was sentenced to time served by Judge Subramanian;
- Cheng Lin, who was responsible for approximately $34,000 in losses and whose Guidelines range was 0 to 6 months' imprisonment, was sentenced to probation by Judge Oetken.

All sentenced defendants have also received some period of probation or supervised release. While Zheng is responsible for a lower loss amount than his co-defendants, in each case, the Government recommended a Guidelines sentence. It is doing the same here, taking into account the defendant's relatively lower culpability, which is reflected in the Stipulated Guidelines Range.

[2] Zhijun Liu entered into a six-month deferred prosecution agreement with the Government.

**C. Conclusion**

For the reasons set forth above, a sentence within the Stipulated Guidelines Range would be sufficient but not greater than necessary to meet the goals of sentencing, taking into account the Section 3553(a) factors.

Respectfully submitted,

JAMES M. McDonald
United States Attorney
Southern District of New York

by: /s/ Cameron Molis
Cameron Molis
Assistant United States Attorney
(212) 637-1085

Cc: Counsel of record, by ECF